# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NATIONAL FOREIGN TRADE COUNCIL, INC., et al. | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) **Case No. 06 C 4251** ) |
| ALEXI GIANNOULIAS[1], et al. | ) ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

It is well documented that for several years, the government of Sudan and the Jinjaweid militia it supports have been committing horrible atrocities against African civilians living in that country's Darfur region.  This case arises out of an attempt by the State of Illinois to put pressure on the government of Sudan to end the human rights violations in Darfur.  In 2005, Illinois adopted the Illinois Act to End Atrocities and Terrorism in the Sudan, 15 ILCS 520/22.5, 15 ILCS 520/22.6, and 40 ILCS 5/1-110.5 (Illinois Sudan Act), which imposes various restrictions on the deposit of state funds in financial institutions whose customers have certain types of connections with Sudan and on the investment of public pension funds in Sudan-connected entities.

The National Foreign Trade Council (NFTC), eight Illinois municipal pension funds, and eight beneficiaries of public pension funds have brought this action pursuant to 42 U.S.C. § 1983

---

[1]  On January 8, 2007, Alexi Giannoulias succeeded Judy Baar Topinka as Illinois State Treasurer.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), Giannoulias is automatically substituted for Topinka as a defendant.

against the Treasurer and Attorney General of Illinois, as well as the Secretary of the Illinois Department of Financial and Professional Regulation, seeking to enjoin enforcement of the Illinois Sudan Act. The Illinois legislature acted with laudable motives, but the Act violates federal constitutional provisions that preclude the states from taking actions that interfere with the federal government's authority over foreign affairs and commerce with foreign countries. For the following reasons, the Court permanently enjoins the defendants from enforcing the Act.

## Background

### 1.        The Illinois Sudan Act

On June 25, 2005, Governor Rod Blageovich signed the Illinois Sudan Act. The Act amends the Deposit of State Moneys Act (15 ILCS 220/22.5-22.6) and the Illinois Pension Code (40 ILCS 5/1-110.5) to prohibit certain investments in the government of Sudan and companies doing business in or with Sudan. The Act seeks to accomplish this goal in two key ways. The Act amends the Deposit of State Moneys Act to prohibit the Illinois Treasurer from depositing state funds into any financial institution that has not certified that it "has implemented policies and practices that require loan applicants to certify that they are not 'forbidden entities,'" as defined by the statute. 15 ILCS 520/22.6(a). A forbidden entity includes the Sudan government, its subdivisions and instrumentalities, any company established under the laws of Sudan or who has its principal place of business there, any company that has been cited by the federal government for violating restrictions concerning Sudan, and, most importantly for this case,

> [a]ny company who has failed to certify under oath that it does not own or control any property or asset located in, have employees or facilities located in, provide goods or services to, obtain goods or services from, have distribution agreements with, issue credits or loans to, purchase bonds or commercial paper issued by, or invest in (i) the Republic of Sudan; or (ii) any company domiciled in the Republic of the Sudan.

2

15 ILCS 520/22.6(b)(1-5). Companies and agencies engaged in humanitarian efforts are not considered forbidden entities. *Id.*; 40 ILCS 5/1-110.5(b).

Before the Act took effect, the state deposited its money in approximately eighty financial institutions. Under the Act, any bank that wants to continue to receive state deposits must establish procedures requiring each of its loan applicants to certify that it is not a forbidden entity as defined in the statute. Since the Act took effect on January 27, 2006, the state has withdrawn $275 million from banks that have been unable or unwilling to comply with the Act.

The Act also amends the Illinois Pension Code to prohibit the fiduciary of any pension fund established under the Code from investing in any entity unless the company managing the fund's assets certifies that:

> (1) the fund managing company has not loaned to, invested in, or otherwise transferred any of the retirement system or pension fund's assets to a forbidden entity any time after the effective date of this Act [January 27, 2006];

> (2) at least 60% of the retirement system or pension fund's assets are not invested in forbidden entities at any time more than twelve months after the effective date of this Act [January 27, 2007]; [and]

> (3) at least 100% of the retirement system or pension fund's assets are not invested in forbidden entities at any time more than eighteen months after the effective date of this act [July 27, 2007].

40 ILCS 5/1-110.5(b). The Pension Code definition of "forbidden entity" includes the definition from the amendment to the Deposit of State Moneys Act, as well as the following:

> (5) Any publicly traded company who has been identified by an independent researching firm that specializes in global security risk as being a company that owns or controls property or assets located in, has employees or facilities located in, provides goods or services to, obtain goods or services from, has distribution agreements with, issue credits or loans to, purchase bonds or commercial paper issued by, or invest in (i) the Republic of the Sudan; or (ii) any company domiciled in the Republic of the Sudan; and

> (6) Any non-publicly traded company that fails to submit to the fund managing
> company an affidavit sworn under oath in which an expressly authorized officer
> of the company avers that the company (i) does not own or control any property
> or asset located in the Republic of the Sudan; and (ii) did not transact business in
> the Republic of the Sudan.

*Id.* Pension funds established under the Code include municipal pension funds, such as the

plaintiff funds, as well as funds whose beneficiaries are state and county employees. These

include, for example, the General Assembly Retirement System, State Employees' Retirement

System of Illinois, and the County Employees' and Officers' Annuity and Benefit Fund. 40

ILCS 5/2-101 *et seq.*, 5/9-101 *et seq.*, 5/14-101 *et seq.*

The purpose of the Act is clear from its title and its text: it is intended to help stop the

atrocities in Sudan. To the extent the purpose of the bill is unclear, the legislative history and

comments by the governor also show that the bill is designed to influence events in Sudan. One

supporter of the bill stated, "I pray that one day we do not have to watch a film with our children

and grandchildren that depicts the horrors of Darfur and once again be asked why the world

failed to act. I ask each of you to vote for this important piece of legislation and let our voices be

heard." 94th General Assembly, House of Representatives, May 17, 2005 at 53 (statement of

Rep. Franks). Another said that the bill used the legislature's "power of the purse strings . . . to

influence . . . erratic or violent or even catastrophic types of activities in other parts of the

world." *Id.* at 56 (statement of Rep. Boland). When he signed the bill, Governor Blagojevich

said, "This bill sends a clear message to the Sudanese government – the people of Illinois will

not condone human rights abuses and genocide, we will take our money elsewhere. I urge all

other states with similar legislation pending to move quickly, to show Sudan that we take human

rights abuses seriously." Press Release, Office of the Governor, Governor ends state investment

in Sudan (June 25, 2005). Finally, the bill's sponsor stated, "[W]hat this legislation does is basically to put economic pressure by pulling out all our public moneys, hoping that this will be a model across the nation." Pl. Mem. Ex 1 (interview with Sen. Collins).

## 2. Federal law regarding Sudan

The federal government's current policy regarding Sudan has its roots in Executive Order No. 13067, signed by President Clinton on November 3, 1997. 62 Fed. Reg. 59989. Executive Order 13067 freezes Sudanese government property located in the United States or within the control of the United States and prohibits many, though not all, transactions between the United States and Sudan. *Id.* § 2. Specifically, the order prohibits seven types of transactions between the United States and Sudan: (1) importation into the United States of any goods or services of Sudanese origin, other than information or informational materials; (2) export to Sudan of goods, technology, or services from the United States or by a United States person (except for humanitarian assistance); (3) facilitation by a United States person of the exportation of goods, technology, or services from or to Sudan; (4) performance of any contract by a United States person in support of an industrial, commercial, public utility, or governmental project in Sudan; (5) granting of credit or loans by any United States person to the Government of Sudan; (6) any transaction by a United States person relating to transportation of cargo to or from Sudan; and (7) any transaction by a United States person or within the United States that is intended to evade the prohibitions in the Order. *Id.* The term "United States person" means a United States citizen, permanent resident alien, entity organized under the laws of the United States, or any person in the United States. *Id.* § 3(c). The Order authorizes the Secretary of the Treasury to implement rules and regulations necessary to carry out the Order's purposes. *Id.* § 5.

In 2000, Congress passed the Trade Sanctions Reform and Export Enhancement Act (TSRA). Pub. L. 106-387, 114 Stat. 1549. The TSRA removes agricultural products, medicine, and medical devices from the list of items that cannot be exported to Sudan. *See* 22 U.S.C. 7202(b). The law prohibits the United States government from providing assistance for commercial exports to Sudan, *id.* § 7207(a)(1), but allows the president to waive the restriction if he deems it necessary for national security or humanitarian reasons. *Id.* § 7207(a)(3).

In 2002, Congress passed the Sudan Peace Act, which gave the president additional authority regarding the United States' relationship with Sudan. Pub. L. 107-245, 116 Stat. 1504 50 (codified at 50 U.S.C. § 1701 note). The Act states, among its goals, that the United States "should use all means of pressure available to facilitate a comprehensive solution to the war in Sudan, including . . . the multilateralization of economic and diplomatic tools to compel the Government of Sudan to enter into a good faith peace process." *Id.* § 2(16)(A). Under the Act, the president must report regularly to Congress on the status of efforts to resolve the conflict in Sudan. The president is directed to take additional action if he certifies that the government of Sudan is not engaging in good faith negotiations to end the conflict or is in violation of any permanent peace agreement. This includes requiring United States directors of international financial institutions to oppose the extension of credit or loans to the government of Sudan, considering suspension of diplomatic relations, taking all "necessary steps, including through multilateral efforts" to deny the government of Sudan oil revenue, and seeking a United Nations Security Council resolution imposing an arms embargo on the government of Sudan. *Id.* § 6(b)(2).

In 2004, Congress passed the Comprehensive Peace in Sudan Act, which supplemented

and amended the Sudan Peace Act in response to events in Darfur. Pub. L. No. 108-497, 118 Stat. 4012 (codified at 50 U.S.C. § 1701 note). The Act instructs the president to pursue several multilateral strategies, including seeking resolutions and sanctions in the United Nations. Among other things, the Act directs the president to seek the imposition of UN economic sanctions if the government of Sudan fails to comply with certain agreements and prior Security Council resolutions. The president is also directed to encourage UN members to impose their own restrictions on the importation of Sudanese oil. The Comprehensive Peace in Sudan Act also directs the president to impose targeted unilateral sanctions on Sudan. These sanctions include refusing to normalize relations with Sudan unless it meets certain conditions and requiring the president to impose the sanctions previously set forth in the Sudan Peace Act. The Act permits the president to waive these sanctions if he deems it to be in the national interest to do so.

In 2006, Congress passed the Darfur Peace and Accountability Act. Pub. L. No. 109-344, 120 Stat. 1869 (codified at 50 U.S.C. § 1701 note). The Act, among other things, amends the Comprehensive Peace in Sudan Act by restricting the travel and freezing the assets of particular Sudanese government officials involved in the Darfur crisis. The Act denies the Sudanese government oil revenues by prohibiting ships or oil tankers engaged in the Sudanese oil sector from entering United States ports. The Act also continues the previously enacted sanctions and reaffirms the president's ability to waive the sanctions under certain conditions.

3.      The parties and the alleged effects of the Illinois Sudan Act

The NFTC is a trade organization authorized to represent its members' interests in

7

matters relating to international trade before Congress, the executive branch, regulatory agencies, and the courts. It contends that its members would be permanently harmed by the enforcement of the Illinois Sudan Act. Among NFTC's members are public corporations that have business connections to Sudan and, therefore, qualify as forbidden entities under the Act in which Illinois public pension funds may no longer invest. NFTC also represents at least one national bank that currently receives state deposits. This bank, and others like it, must cease accepting loan applications from forbidden entities or forego the continued deposit of state funds. In addition, NFTC member companies with ties to Sudan are no longer able to apply for loans from banks that have decided to continue to accept state deposits. The other plaintiffs are Illinois municipal pension funds that claim they have been harmed because they have had their investment choices restricted because of the Illinois Sudan Act, and eight individual beneficiaries of public pension funds. The defendants are the state officials responsible for enforcing the Illinois Sudan Act. They are sued only in their official capacities.

## Discussion

Plaintiffs seek to enjoin enforcement of the Illinois Sudan Act on four grounds. They argue that the Act is preempted by federal law governing relations with Sudan, interferes with the federal government's ability to conduct foreign affairs, violates the Constitution's Foreign Commerce Clause, and is preempted by the National Bank Act, 12 U.S.C. §§ 21-216(d).

The plaintiffs initially moved for a preliminary injunction, but with the parties' agreement, the Court combined the hearing on the motion with trial on the merits pursuant to Federal Rule of Civil Procedure 65(d)(2). The parties have agreed on the material facts. *See* Order of Nov. 13, 2006.

In deciding whether to grant permanent injunctive relief, a court must consider whether the plaintiffs have succeeded on the merits; whether they have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; whether the threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendants; and whether granting the injunction will harm the public interest. *See, e.g.*, *Plummer v. Am. Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).

### 1. Supremacy Clause

Plaintiffs argue that the Illinois Sudan Act violates the Constitution's Supremacy Clause because the Act is preempted by federal laws governing relations with Sudan. Federal law can preempt state law in three ways. First, Congress can expressly state its intention to occupy a field. *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). The parties agree that express preemption does not apply here. Second, federal law can preempt state law "[i]f Congress evidences an intent to occupy a given field." *Id.* Third, federal law can preempt state law "to the extent that [the state law] actually conflicts with federal law." *Id.* Conflict preemption can exist when it is impossible for a party to comply with both the federal and state law or when, "under the circumstances of [a] particular case, [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal law. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Felder v. Casey*, 487 U.S. 131, 138 (1988).

Plaintiffs concede that it is possible to comply with both federal law regulating business dealings with Sudan and the Illinois Sudan Act. Plaintiffs claim instead that the Illinois Sudan Act is preempted because Congress intended to occupy the entire field of United States foreign

relations with Sudan and that the Act conflicts with federal law because it frustrates the federal government's purposes and objectives regarding relations with Sudan.  As the Supreme Court has recognized, "field pre-emption may be understood as a species of conflict pre-emption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (citing *English v. General Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

As the Court has discussed, the Illinois Sudan Act amends the Deposit of State Moneys Act to prohibit the State Treasurer from depositing funds in a financial institution unless it annually certifies that it has "implemented policies and practices that require loan applicants to certify that they are not forbidden entities."  15 ILCS 520/22.6(a).   It also amends the Illinois Pension Code to require public pension funds to divest themselves of investments in forbidden entities.  As discussed earlier, the definition of "forbidden entity" in the banking section of the Act is quite broad, including virtually any company that has business dealings in or with Sudan.  The definition of "forbidden entity" in the pension section of the Act is even broader.  *See supra* at 3-4.

Unlike the federal sanctions scheme, the Illinois Sudan Act includes no "safety valve" allowing the Treasurer to make exceptions and no provision regarding suspension or non-enforcement, except a provision that the Act will remain in effect "until such time as the government of the United States, through Executive Order or otherwise, rescinds Executive Order 13067 . . . ."  Public Act 94-079, § 90.  In addition, the Illinois Sudan Act prohibits some transactions that are not barred under the federal scheme.  For example, the federal restrictions do not apply to foreign subsidiaries of U.S. companies; the Illinois Sudan Act does.  The federal sanctions no longer apply to specific regions of Sudan, such as Southern Sudan, Blue Nile State,

Darfur and certain areas near Khartoum.  Exec. Order No.  13412 § 4(b), 71 Fed.  Reg.  61369 (Oct.  13, 2006).  By contrast, the Illinois Sudan Act applies to entities doing business with companies "domiciled in the Republic of Sudan," which includes those areas no longer subject to federal sanctions.  15 ILCS 520/22.6(b).  The national Sudan policy now allows the provision of "non-lethal military equipment" to Southern Sudan.  *See* Determination Pursuant to the Darfur Peace and Accountability Act Related to the Provision of Military Assistance in Support of a Southern Sudan Security Sector Transformation Program (SST), 72 Fed. Reg. 2326 (Jan. 18, 2007).  The Illinois Sudan Act, however, would define as a "forbidden entity" any company that provides equipment or services pursuant to this amendment to the federal policy.[2]

The Supreme Court addressed a similar scenario in *Crosby*.  In *Crosby*, the Supreme Court affirmed a First Circuit ruling that federal law delegating discretion to the president to control economic sanctions against Burma preempted a Massachusetts law prohibiting that state and its agencies from buying goods or services from companies doing business with Burma.  The Massachusetts law generally barred state entities from buying goods or services from any individual or corporation identified on a "restricted purchase list" of entities doing business with Burma.  *Crosby*, 530 U.S. at 366.  Like the Illinois statute, the Massachusetts statute had no provision allowing the state to waive or terminate the ban.  It did, however, contain a variety of exemptions, in contrast to the Illinois Sudan Act.  *See id.* at 367-68.

---

[2]  Defendants argue that the January 2007 determination by the United States Secretary of State does not conflict with the Illinois Sudan Act, because the Republic of Sudan granted Southern Sudan autonomy in 2005, and a referendum for independence is scheduled for 2011. *See* CIA World Factbook – Sudan, https://ww.cia.gov/cia/publications/factbook/geos/su.html. As of now, however, Southern Sudan is still part of the Republic of Sudan even if it enjoys autonomy.  *Id.*  On its face, the Illinois Sudan Act applies to entities doing business in all parts of Sudan.

Three months after Massachusetts adopted its Burma law, Congress passed a statute imposing sanctions on Burma. The federal statute imposed direct sanctions on Burma, *i.e.*, a ban on aid to the Burmese government, instructed U.S. representatives to international financial institutions to vote against loans to Burma, and, generally speaking, denied entry visas to Burmese government officials. These restrictions were to remain in effect until "the President determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government." *Id.* at 368 (citation omitted).

The federal statute regarding Burma also authorized the president to impose additional sanctions if he determined that the Burmese government had undertaken certain activities. The additional sanctions included prohibiting "United States persons" from "new investment" in Burma. *Id.* (citation omitted). "New investment" included any contract that would favor the "economical development of resources located in Burma," but specifically excluded "entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology." *Id.* (citation omitted). The federal statute also directed the president to develop "a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma." *Id.* at 369 (citation omitted). The president did so by issuing an executive order in May 1997. Finally, the federal statute authorized the president "to waive, temporarily or permanently, any sanction [under the federal Act] . . . if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States." *Id.* (citation omitted).

The Supreme Court held that the Massachusetts Burma law imposed an obstacle to the

accomplishment of Congress' full objectives under the federal statute. *Id.* at 374. It found that

the state law undermined at least three provisions of the federal Burma law: its delegation of

discretion to the president to control economic sanctions against Burma, its imposition of

sanctions only on United States persons and new investment in Burma, and its directive to the

president to proceed diplomatically in developing a comprehensive, multilateral strategy toward

Burma. *Id.* The Court reasoned that Congress intended the federal law to provide the president

with flexible authority over economic sanctions against Burma. *Id.* at 374. The Court also found

it highly significant that Congress had empowered the president to waive or suspend the

sanctions if he felt it would be in the national security interests of the United States. *Id.* In short,

the Court found it to be

> simply implausible that Congress would have gone to such lengths to empower
> the President if it had been willing to compromise his effectiveness by deference
> to every provision of state statute or local ordinance that might, if enforced, blunt
> the consequences of discretionary Presidential action.

*Id.* at 376. The Massachusetts law, said the Court, imposed a different system of economic

pressure against Burma than the federal law, and penalized some private action that the federal

act did not reach. *Id.* For these reasons, the Court concluded that the Massachusetts law

violated the Supremacy Clause. *Id.* at 388.

Defendants suggest that *Crosby* is distinguishable from the present case and urge the

Court to follow *Board of Trustees v. City of Baltimore*, 562 A.2d 720 (Md. 1989), and rule that

federal law regarding Sudan does not preempt the Illinois Sudan Act. In *Board of Trustees*, the

Maryland Court of Appeals upheld Baltimore city ordinances requiring city pension funds to

divest their holdings in companies doing business in South Africa. The court reasoned that

pension funds are historically regulated by state and local governments and that as a result, there

13

was a strong presumption against preemption. *Id.* at 741. The court also disagreed with the plaintiff's contention that the ordinances conflicted with the national government's "carrot and stick" approach to South Africa. *Id.* at 743. The court stated that "[u]nlike the federal statute, the Ordinances are not aimed directly at the conduct of the South African government but rather at the conduct of businesses in which the City has investments." *Id.*

The Court does not consider *Board of Trustees* to be particularly persuasive authority in the present case, for several reasons. First, it was decided before the Supreme Court's decisions in *Crosby* and *Am. Ins. Ass'n. v. Garamendi*, 539 U.S. 396, 401 (2003), which clarified the Supreme Court's view on the power of the national government to conduct foreign affairs. Second, *Board of Trustees'* reliance on a presumption against preemption is unpersuasive. Though pension funds may be traditionally regulated by the states, none of the cases cited in *Board of Trustees* to support the presumption of validity involved a possible conflict with a federal law regarding foreign affairs. *Board of Trustees*, 562 A.2d at 741 (citing *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) (no preemption of state antitrust laws); *Hillsborough County, Fla. v. Automated Medical Labs.*, 471 U.S. 707, 723 (1985) (no preemption of state blood donor laws); *Pacific Gas & Elec. v. Energy Resources Comm.*, 461 U.S. 190, 222 (1983) (upholding state law regulating construction of nuclear power plants); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959) (section of state labor laws preempted by Labor Management Relations Act)). The Maryland court's reliance on these cases does not take into account the federal government's supremacy over the states in regulating foreign affairs. *See Hines*, 312 U.S. at 62 ("the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution."). *See also Zschernig v. Miller*, 389 U.S. 429, 440

(1968) (although states have traditionally regulated estates, "those regulations must give way if they impair the effective exercise of the Nation's foreign policy.").

The court in *Board of Trustees* cited no authority for the proposition that state laws – even those related to traditional areas of state regulation – are presumed not to be preempted by federal foreign affairs laws. In light of the national government's strong interest in conducting foreign affairs, it is not surprising that the defendants do not cite, and the Court has been unable to locate, any such authority. To the contrary, "when Congress legislates in an area of foreign relations, there is a strong presumption that it intended to preempt the field." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 76 (1st Cir. 1999) (relying on *Hines* and its progeny).

Finally, the court's conclusion in *Board of Trustees* that the divestment ordinances were not preempted because divestment did not target South Africa directly, but rather entities doing business in South Africa, is likewise unpersuasive. The Supreme Court expressly rejected that rationale in *Crosby*. *Crosby*, 530 U.S. at 378 ("[w]hile the state Act differs from the federal in relying entirely on indirect economic leverage through third parties with Burmese connections, it otherwise stands in clear contrast to the congressional scheme . . . .").

Most importantly, however, the Baltimore ordinances at issue in *Board of Trustees* dealt with pension fund divestment, an activity distinct from the procurement boycott in *Crosby* or the banking restrictions in the Illinois Sudan Act. In this regard, the Court finds that *Crosby* is on point. Both the Illinois Sudan Act and Massachusetts Burma Act attempt to influence foreign policy directly by encouraging business entities not to do business with a foreign country; if the entities decide not to do so, they lose their ability to do business with the state. In *Crosby*, NFTC represented companies who had their ability to sell goods to Massachusetts restricted. In

this case, NFTC represents (with regard to the amendment to the Deposit of State Moneys Act) banks who have had their ability to accept Illinois deposits restricted. The only difference is that the plaintiffs in *Crosby* sold goods to Massachusetts at a profit, while in this case plaintiffs sell banking services to Illinois at a profit. Therefore, the Court will look to the Supreme Court's holding in *Crosby* to determine whether the Act's amendments to the Deposit of State Moneys Act conflict with the federal laws and regulations.

The Court first must determine whether the Act's amendments to the Deposit of State Moneys Act interfere with the federal government's conduct of foreign relations. *See Garamendi*, 539 U.S. at 401. Federal Sudan policy, like the Burma policy, provides the president with flexibility to effect "carrot and stick" diplomacy. Federal law allows the president, among other things, to impose "targeted sanctions" against particular Sudanese officials, issue "specific licenses" to authorize otherwise prohibited transactions, and waive application of the sanctions if he "determines and certifies to the appropriate congressional committees that such a waiver is in the national interest of the United States." 50 U.S.C. § 1701 note, § 6(f)(2). In short, Congress gave the president broad leeway to impose, or decide not to impose, an array of sanctions. The Illinois Sudan Act, however, does not allow for such flexibility. It does not allow for a temporary suspension of sanctions or a specific waiver, even if the president deemed such an action to be in the national interest. Moreover, the Act now applies to areas of Sudan, such as Southern Sudan and Blue Nile, that are no longer subject to federal sanctions. This difference between the federal policy and the Illinois Sudan Act is a direct conflict and highlights a fundamental difference between the Act and the federal policy. Federal law permits the president to change policy rapidly in response to developments in Sudan,

but there is no such mechanism in the Illinois Sudan Act.

In addition, unlike the federal Sudan scheme, which applies only to United States entities, the Act applies to all entities, including overseas subsidiaries or affiliates of United States corporations. *Crosby* cited the importance of a similar conflict when striking down the Massachusetts Burma law. *Crosby*, 530 U.S. at 373. The Court likewise concludes that the breadth of the amendments to the Deposit of State Moneys Act stand as an obstacle to the accomplishment of the national government's objectives vis-à-vis Sudan.

In sum, the Court concludes that the Illinois Sudan Act's lack of flexibility, extended geographic reach, and impact on foreign entities interferes with the national government's conduct of foreign affairs. As a result, the provision of the Illinois Sudan Act amending the Deposit of State Moneys Act is preempted by federal law.

The Illinois Sudan Act's amendment to the Illinois Pension Code, however, is a different matter. Though federal law expressly restricts how companies can and cannot do business in Sudan, it is silent regarding divestment of holdings connected with Sudan. Moreover, the potential effects of pension fund divestment on the national government's ability to conduct foreign policy are highly attenuated. The amendments to the Deposit of State Moneys Act directly impact the ability of banks and corporations to do business with Sudan and therefore interfere with federal policy by pressuring them to cut ties with that country. By contrast, the amendment to the Illinois Pension Code merely prohibits state and municipal pension funds from investing in companies that do business with or in Sudan. The Court has been presented with no evidence suggesting that these pension funds' inability to purchase the securities of such companies would be in any way likely to affect their decision to do business in that country. As

a result, plaintiffs have not shown that pension fund divestment stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" with regard to Sudan policy. *Crosby*, 530 U.S. at 372 (citation omitted). The Court therefore concludes that federal law regarding relations with Sudan does not preempt the provision of the Illinois Sudan Act that amends the Illinois Pension Code.

### 2. Foreign affairs power

Plaintiffs also argue that the Illinois Sudan Act is unconstitutional because it intrudes on the federal government's exclusive authority to conduct foreign affairs. It is undisputed that the federal government, and the president in particular, have the "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring). *See also Hines*, 312 U.S. at 62 ("the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution."). At issue is whether the Illinois Sudan Act actually interferes with the power of the national government to regulate foreign affairs. *See Garamendi*, 539 U.S. at 401.

Plaintiffs contend that the Act is intended to engage Illinois in foreign affairs and interferes with the federal government's foreign affairs power in several ways. They argue that the differences between the Illinois Sudan Act and federal policy create the potential for embarrassment to the United States in the conduct of its foreign relations, the Act requires repeated inquiries into the internal affairs of Sudan by the state defendants, and the harm created by the Act is magnified by other states' potential adoption of similar measures. Pl. Mem. at 26-28.

Only a small number of federal court cases address the ability of state and local

governments to pass laws that touch on foreign affairs. The Seventh Circuit has never directly addressed the issue.[3] The Supreme Court has addressed the issue only twice in the past forty years. In both cases, the Court struck down the state law at issue as violative of the federal government's authority to conduct foreign affairs. In *Zschernig,* the Court struck down an Oregon law that barred non-resident aliens from inheriting property unless they could establish that the alien's country allowed reciprocal rights to United States citizens to take property on the same terms as a citizen of that country, permitted United States citizens to receive payments from estates in the foreign country, and allowed foreign heirs to receive the proceeds of Oregon estates without confiscation by their home government. 389 U.S. at 430-31. The Court held that the Oregon law violated the foreign affairs powers conferred upon the national government by the Constitution because it required Oregon judges to examine foreign law to "ascertain whether 'rights' protected by foreign law are the same 'rights' that citizens of Oregon enjoy," *id.* at 440, and was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the president and the Congress." *Id.* at 432. State court decisions interpreting the Oregon law, said the Court, demonstrated that "foreign policy attitudes, the freezing or thawing of the 'cold war,' and the like are the real desiderata. Yet they of course are matters for the Federal Government, not for local probate courts." *Id.* at 437-38.

More recently, the Supreme Court struck down a California law requiring insurance companies doing business in that state to disclose information regarding Holocaust-era insurance

---

[3] The only reference to the subject in Seventh Circuit precedent is *dicta* in a case involving whether a state law was preempted by the Securities Exchange Act. *See MITE Corp. v. Dixon*, 633 F.2d 486, 491 (7th Cir. 1980) ("In the realms of national security and foreign affairs, state legislation has been held implicitly preempted because both areas are of unquestionably vital significance to the nation as a whole.").

policies. *Garamendi*, 539 U.S. at 401. In *Garamendi*, the Court held that California's Holocaust

Victim Insurance Relief Act (HVIRA) conflicted with the president's foreign policy authority

embodied in executive agreements negotiated with several European leaders. The *Garamendi*

court concluded that

> the consistent Presidential foreign policy has been to encourage European
> governments and companies to volunteer settlement funds in preference to
> litigation or coercive sanctions . . . . As for insurance claims in
> particular, the national position, expressed unmistakably in the executive
> agreements signed by the President with Germany and Austria, has been to
> encourage European insurers to work with the ICHEIC [International
> Commission on Holocaust Era Insurance Claims] to develop acceptable claim
> procedures, including procedures governing disclosure of policy information.
> ...
> California has taken a different tack of providing regulatory sanctions to compel
> disclosure and payment, supplemented by a new cause of action for Holocaust
> survivors if the other sanctions should fail.
> ...
> HVIRA's economic compulsion to make public disclosure, of far more information about
> far more policies than ICHEIC rules require, employs "a different, state system of
> economic pressure," and in doing so undercuts the President's diplomatic discretion and
> the choice he has made exercising it. [citing *Crosby*, 530 U.S. at 376]. Whereas the
> President's authority to provide for settling claims in winding up international hostilities
> requires flexibility in wielding 'the coercive power of the national economy' as a tool of
> diplomacy, *id.* at 377, HVIRA denies this, by making exclusion from a large sector of the
> American insurance market the automatic sanction for noncompliance with the State's
> own policies on disclosure. "Quite simply, if the [California] law is enforceable the
> President has less to offer and less economic and diplomatic leverage as a consequence."
> [*Id.*]. The law thus "compromise[s] the very capacity of the President to speak for the
> Nation with one voice in dealing with other governments" to resolve claims against
> European companies arising out of World War II. [*Id.* at 381].
> ...
> The basic fact is that California seeks to use an iron fist where the President has
> consistently chosen kid gloves.

*Id.* at 539 U.S. at 421, 423-24, 427.

Like California in *Garamendi*, Illinois has taken a different tack from the one embodied

in the federal policy. The federal policy gives the president flexibility to waive or suspend

provisions if he deems it to be in the national interest; the Illinois Sudan Act does not.  The national policy applies only to U.S. entities; the Illinois Sudan Act applies to foreign subsidiaries of U.S. entities.  The president has flexibility to modify the nation's approach to Sudan, but the Illinois Sudan Act remains in effect unless Executive Order 13067 is repealed.  The Act applies to every region of Sudan, while the national policy now carves out certain geographic areas.  Though it may be a stretch to say that the Act uses an iron fist where the national Sudan policy uses kid gloves, it is not a stretch to say that the state has chosen a more heavy-handed approach than the national government.  As discussed earlier, the Act provides no ability to maneuver.  There is little doubt, therefore, that the federal government and the State of Illinois have taken different approaches to achieve the same goal – ending human rights abuses in Sudan.

On the other hand, though both *Zschernig* and *Garamendi* presume a broad role of the national government in foreign affairs, they do not delineate with clarity what role, if any, the states retain.  Nor do these cases clearly establish a test to apply to a state or local law to determine whether it interferes with the national government's foreign affairs powers.  Though the cases place an emphasis on the ability of the president to speak for the nation with "one voice," *Garamendi*, 539 U.S. at 422, the inquiry quite obviously does not end there.  For example, *Zschernig* and *Garamendi* would not appear to prohibit a state or local government from issuing a resolution condemning the actions of a foreign government, even if the national government had made no such declaration or did not support such a view.  In such a case, although the United States would not be speaking with "one voice," the absence of actual hindrance to the national government's conduct of foreign policy would appear to preserve the state or local enactment.

Without some tangible effect or the risk of such an effect, it would be difficult to see how a state or local policy could interfere with the national government's conduct of foreign affairs. For example, it does not appear that state and local governments are prohibited from entering into "sister state" agreements or other bilateral agreements with sub-national foreign governments or foreign trade associations. *See Natsios*, 181 F.3d at 50. Rather, *Zschernig* and *Garamendi* are both concerned with the practical effect a state law might have on the national government's ability to conduct foreign policy on behalf of the United States. In *Zschernig*, the Court found that the Oregon law "may well adversely affect the power of the central government to deal with" international relations, *Zschernig*, 389 U.S. at 440-41, and in *Garamendi*, it found that the California law meant that "the President has less to offer and less economic and diplomatic leverage . . . ." *Garamendi*, 539 U.S. at 424 (citation omitted).

The Illinois Sudan Act's amendments to the Deposit of State Moneys Act would have an impact on the national government's ability to deal with Sudan that is at least equal to or greater than the impact of the state laws in *Zschernig* and *Garamendi*. Where *Zschernig* dealt with a neutral law aimed at all foreign states, and *Garamendi* addressed a policy affecting several European nations, the Act is targeted at only one country. The Act's potential effects, therefore, are magnified. *See Tayyari v. New Mexico State University*, 495 F. Supp. 1365, 1379 (D. N.M. 1980) (local regulation regarding only Iran was much more likely to affect international relations with that country than a regulation aimed at all countries). Moreover, as a result of the state's enactment, non-compliant banks have lost $275 million in state deposits. The risk of losing state deposits could, as the Illinois Legislature hoped, pressure banks to stop accepting loan applications from entities doing business in Sudan. These entities could, as a result, feel pressure

to sever their ties to Sudan.

For these reasons, the amendments to the Deposit of State Moneys Act "clearly [have] more than an 'incidental or indirect effect in foreign countries.'" *Natsios*, 181 F.3d at 52 (citing *Clark v. Allen*, 331 U.S. 503, 517 (1947)). If multinational corporations pull out of Sudan, the effect on that country's economy will be real and direct. That, of course, is the very purpose of economic sanctions. In addition, these amendments have a substantive and direct impact on the national government's ability to carry out the flexible and measured approach to Sudanese relations that Congress and the president have created. As discussed earlier, these provisions sanction some conduct that the federal policy permits, and include no mechanism for adjustment in response to changing political conditions in Sudan.

Defendants argue that courts must consider the degree of impact of a state law on foreign affairs and urge the Court to follow the holding in *Board of Trustees* that divestment statutes have a minimal impact. The Court agrees that the degree of impact a state law has or might have on the national government's conduct of foreign affairs is the relevant inquiry. *See Zschernig*, 389 U.S. at 440. But because the Act's amendments to the Deposit of State Moneys Act do not involve divestment from pension funds, *Board of Trustees* is not on point. The Court concludes that the section of the Illinois Sudan Act that amends the Deposit of State Moneys Act (15 ILCS 220/22.5-22.6) unconstitutionally interferes with the federal government's power to conduct foreign affairs.

The Court reaches the opposite conclusion, however, regarding the provisions of the Illinois Sudan Act that amend the Illinois Pension Code. These provisions simply bar state and municipal pension funds from investing in the securities of companies that do business in Sudan.

Plaintiffs have not shown that the Pension Code amendment risks anything more than a hypothetical impact on the national government's conduct of foreign affairs.

When a corporation issues stock to the public, either through an initial or secondary offering, it seeks the highest price it can obtain. The inability of public pension funds to invest in a particular company's stock means, in theory, that there is reduced demand for that offering, which (all else being equal), could decrease the price for the stock. Whether the Illinois Sudan Act actually would have that effect, however, is entirely speculative. Plaintiffs have identified several publicly traded NFTC members that have business connections to Sudan whose securities are now off limits to Illinois public pension funds (*e.g.*, Coca Cola Company, Eastman Kodak Company, Ingersoll-Rand Company, and Toyota Motor Corp., among others). Decl. of William A. Reinsch ¶ 10. But the plaintiffs have presented no evidence regarding what plans, if any, these companies have for a secondary offering – the only scenario under which these and other public companies could issue stock directly to the public pension funds – and no evidence regarding the size of the potential market for such securities or what share of the market Illinois public pension funds occupy. The same analysis applies to these corporations' issuance of bonds. Absent such evidence, there is no basis upon which the Court can find that the Illinois Sudan Act is likely to diminish the market for publicly traded corporations' follow-on offerings in a way that could lead them to alter their willingness to do business in Sudan. Such a finding would be necessary to a determination that the Act interferes with the federal government's foreign affairs power.

To the extent plaintiffs' contentions concern pension funds' inability to purchase securities traded after an initial or secondary offering, they likewise do not succeed. On the

present record, it is entirely speculative whether the market value of the stock or bonds of a company with ties to Sudan are affected in any way by the fact that these securities cannot be purchased by Illinois public pension funds on the open market.  A virtually unlimited number of factors affect the price at which a corporation's stock and bonds are traded.  There is no basis in the evidence presented to the Court to say that the Illinois Sudan Act would have any effect, let alone what it would be.  And although there is little doubt that corporations prefer to have the market value their securities highly, increases or decreases in price typically have, at most, only an indirect impact on a company's profitability.

The effect of the Act's amendments to the State Deposit of Moneys Act is, by contrast, anything but speculative.  Banks already know that they have lost $275 million in deposits due to the Act.  The state's refusal to do business with banks that do not certify that none of their loan applicants do business with Sudan has an immediate and direct effect on those banks' bottom line and, therefore, their likely attitude toward extending loans to companies with ties to Sudan.  This, in turn, puts pressure on the bank's customers to choose between severing ties to Sudan or continuing their banking relationships.

Plaintiffs argue that the Act's amendment to the Illinois Pension Code has a similar effect on corporations with ties to Sudan because the pension funds can no longer invest in their equity or debt instruments.  The Court is not persuaded that the inability to offer debt or equities to Illinois public pension funds imposes a burden on corporations that makes them more likely to alter their relationships with entities doing business in Sudan.  As the Court has discussed, the claim is speculative, at least on the present record.

Finally, plaintiffs go to great lengths to show the negative effect the Illinois Sudan Act is

having on the pension fund plaintiffs and their beneficiaries. They contend that the Act curtails the investment choices available to the funds and, therefore, the potential returns the funds may receive. Pl. Mem. at 37. That may well be so. But for plaintiffs' foreign affairs argument, this is of no consequence. What matters is the Illinois Sudan Act's effect on the federal government's authority to conduct foreign affairs. The section of the Act amending the Illinois Pension Code does not interfere with that authority.

### 3. Foreign Commerce Clause

Plaintiffs also argue that the Illinois Sudan Act violates the Foreign Commerce Clause. U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have power to . . . regulate commerce with foreign nations . . . ."). State regulations that facially discriminate against foreign commerce are *per se* invalid. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006). In addition, nondiscriminatory state regulations affecting foreign commerce violate the Foreign Commerce Clause if they create a substantial risk of conflicts with foreign governments or impede the federal government's ability to speak with one voice in regulating commercial affairs with foreign states. *Id. See also Japan Line v. County of Los Angeles*, 441 U.S. 434, 446 (1979).

Plaintiffs argue that the Illinois Sudan Act is facially discriminatory because its purpose is to limit commerce with Sudan by directly penalizing entities if they engage in such commerce. Defendants respond that the Illinois Sudan Act does not implicate commerce at all and "merely creates two prohibitions: public pension funds may not invest in companies supporting the genocidal Sudanese regime, and institutions that fail to certify that they are free from Sudan connections may not be depositories of State monies." Def. Resp. at 21-22. Defendants' argument, however, merely highlights that the Act *does* implicate foreign commerce.

Defendants all but concede that the Act is "designed to limit trade with a specific foreign nation." *Natsios*, 181 F.3d at 67. The prohibitions to which defendants refer limit the ability of affected banks and corporations to do business with Sudan and entities that have connections to Sudan.

Defendants cite *dicta* from *United States v. Lopez*, 514 U.S. 549, 602 (1995), and *United States v. Morrison*, 529 U.S. 598, 608 (2000), for the proposition that Congress' Commerce Clause power is limited and that the Illinois Sudan Act does not affect commerce at all. These cases are not on point. *Lopez* and *Morrison* concern the Interstate Commerce Clause; they do not address the scope of the Foreign Commerce Clause. "[T]here is evidence that the Founders intended the scope of the foreign commerce power to be . . . greater [than the Interstate Commerce Clause]" because "of the Framers' overriding concern that the Federal Government must speak with one voice when regulating commercial relations with foreign governments." *Japan Lines*, 441 U.S. at 448-49 (internal quotation marks and citation omitted). Moreover, it is insufficient for Illinois to say that commerce is not implicated because a bank can forego accepting money from the state or a corporation can forego having pension funds own its securities. As the First Circuit has stated, "every discriminatory state law can be avoided by withdrawing from the enacting state . . . . To allow state laws to stand on this ground, however, would be to read the Commerce Clause out of the Constitution." *Natsios*, 181 F.3d at 70. In short, there is little doubt that the conduct the Illinois Sudan Act seeks to proscribe involves foreign commerce.

Defendants argue that even if the Foreign Commerce Clause applies, plaintiffs' constitutional challenge fails because the state entities are merely acting as market participants

and thus are not subject to Commerce Clause restrictions. When states are acting as "proprietors," they are not bound by the limits of the Interstate Commerce Clause. *College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 685 (1999) ("Since state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants, evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause.") (citation omitted). *See also Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980) (market participant doctrine protects states when they are acting as parties to a commercial transaction rather than market regulators).

It is not a foregone conclusion, however, that the market participant exception applies to the Foreign Commerce Clause. Courts have split on the issue. In *Trojan Technologies, Inc. v. Commonwealth of Pennsylvania*, 916 F.2d 903 (3rd Cir. 1990), the Third Circuit addressed a Foreign Commerce Clause challenge to a state statute requiring suppliers to public agencies to provide products using only American-made steel. *Id.* at 904-05. The court concluded that the market participant exception applied. It based its conclusion, however, on the fact that the statute in question was a "buy American" law, not directed at any particular foreign government. *Id.* at 910. The New Jersey Supreme Court reached a similar result in a "buy American" case, holding that, for purposes of the factual context before it, there were no differences between the Foreign Commerce Clause and the Interstate Commerce Clause. *K.S.B. Technical Sales Corp. v. North Jersey District Water Supply Comm.*, 381 A.2d 774, 788 (N.J. 1977).

On the other hand, in *Natsios*, a case involving a law much more akin to the Illinois Sudan Act than a buy-American statute, the First Circuit held that there is no market participant

exception to the Foreign Commerce Clause.  The *Natsios* court expressly disagreed with *Trojan Technologies*, stating,

> [W]e believe that the risks inherent in state regulation of foreign commerce –
> including the risk of retaliation against the nation as a whole and the weakening
> of the federal government's ability to speak with one voice in foreign affairs . . . –
> weigh against extending the market participation exception to the Foreign
> Commerce Clause.  When it comes to state actions that touch on foreign affairs,
> "[a] foreign government has little inclination to discern whether a burdensome
> action taken by a political subdivision of the United States was taken under a
> proprietary or a regulatory guise," and "the potential for the creation of friction
> between the United States and a foreign nation is not lessened because the state
> acts as a proprietor instead of a regulator."

*Natsios*, 181 F. 3d at 66 (citations omitted).

Neither the Supreme Court nor the Seventh Circuit has addressed whether a "market participant" exception applies to the Foreign Commerce Clause.  The Supreme Court has, however, stated that scrutiny of state "proprietary actions" may well be more rigorous when a restraint on foreign commerce is alleged.  *Reeves,* 447 U.S. at 437 n.9.

The Court need not resolve this issue.  Even if the market participant exception applies to the Foreign Commerce Clause, Illinois is not acting exclusively as a market participant through its enforcement of the Illinois Sudan Act.  The Act's amendment to the Pension Code affects not just state-controlled pension funds but also the pension funds of municipal entities.  The Seventh Circuit has held that the market participant doctrine does not apply to the state when the market participants are local political subdivisions.  *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486 (7th Cir. 1984).

In *Bernardi*, the Seventh Circuit upheld an order enjoining enforcement of a state law preventing local governments from giving construction contracts to employers of non-residents. The defendant argued that the market participation doctrine prevented application of the

Interstate Commerce Clause. The court held, however, that local political subdivisions were not part of the state for purposes of the market participant doctrine. *Id.* at 496. Because the projects at issue were not financed or administered by the state, "[t]he state is a regulator, telling thousands of local government units that they must not give construction contracts to employers of nonresidents." *Id.* at 495. Moreover, "[t]he preference law applies to every public construction contract in Illinois, even if the purchaser is a local school board, or for that matter the local dog catcher." *Id.*

The municipal pension fund plaintiffs in this case are in the same position as the local governments in *Bernardi*. Though the state regulates municipal pension funds through the Illinois Pension Code and related regulations, the funds are administered by locally-appointed boards and are funded by employee contributions and contributions by the municipalities. Decl. of David J. Wall ¶ 5.

At oral argument, defendants argued that the state guarantees municipal pension fund benefits and that as a result, the funds and their beneficiaries would suffer no injury even if the Act decreased the funds' investment returns. The same point arguably affects the "market participant" argument: if the state guarantees local pension fund benefits, the state could be claimed to be a market participant.

The defendants' argument, however, does not withstand close scrutiny. Defendants' sole authority for the proposition that the state guarantees public pension funds is a provision in the Illinois Constitution stating that "[m]embership in any pension or retirement system of the State, or any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or

impaired." Ill. Const. art. XIII, § 5. Contrary to defendants' assertions, this provision does not suggest that the state will pay benefits if a municipal pension fund is underfunded or becomes insolvent. Rather, it creates a contractual relationship between a beneficiary and the pension fund, preventing the fund or the legislature from changing the rules so as to diminish the pensioner's benefits. *See Felt v. Bd. of Trustees of the Judges Retirement Sys.*, 107 Ill. 2d 158, 163, 481 N.E.2d 698, 700 (1985) (amendment to Pension Code that changed basis for benefit calculation from salary on last day of service to average salary in final year of service reduced benefits in violation of Article 13, section 5 of Illinois Constitution). In short, there does not appear to be any support for defendants' contention that the state guarantees the benefits of municipal pensioners. As a result, under *Bernardi*, the state cannot be considered a market participant when it proscribes the investment choices of municipal pension funds.[4] Without the protection of the market participant exception, the amendment to the Pension Code violates the Foreign Commerce Clause.

The amendment to the Pension Code also restricts the investment choices of state-funded pensions. *Bernardi* applies only to political subdivisions of the state and, therefore, would not preclude a finding that the state is a market partcipant with regard to its regulation of the pensions it funds and administers (*e.g.*, the General Assembly Retirement System and State Employees' Retirement System of Illinois).[5] The Illinois Sudan Act's amendment to the

--------

[4] Because the Court has already found the Act's amendments to the Deposit of State Moneys Act to conflict with federal law and to infringe upon the national government's foreign affairs power, the Court need not address plaintiff's Commerce Clause challenge to that part of the Act.

[5] There, of course, may be other reasons why the state does not function as a market participant through the restrictions it has placed on the investment choices of state-funded

Pension Code, however, is a single provision that applies to any "retirement system or pension fund established under [the] Code." 40 ILCS 5/1-110.5(a). Even if the Court were to find that the amendment to the Pension Code would pass constitutional muster if only applied to state-funded pensions, the Court could not sever the unconstitutional portion of the statute. Under Illinois law, a statutory provision containing an unconstitutional section may be severed from the rest of the statute if "what remains is complete in itself and is capable of being executed wholly independently of the severed portion." *People v. Jordan*, 218 Ill. 2d 255, 267, 843 N.E.2d 870, 877 (2006). Because the amendment to the Pension Code applies to all "pension fund[s] established under [the] Code," nothing remains of the statute that can function independently.

To find the amendment to the Pension Code constitutional as applied to state-funded pensions, the Court would have to rewrite the Illinois Sudan Act to bring it into compliance with the Foreign Commerce Clause. This the Court cannot do. *See Virginia v. Am. Bookseller's Ass'n*, 484 U.S. 383, 397 (1988) (stating "we will not rewrite a state law to conform it to constitutional requirements."). *See also Consol. Cigar Corp. v. Reilly*, 218 F.3d 30, 56 (1st Cir. 2000) (stating that courts must "take care not to trample legislative or executive province of state authorities by making unduly substantive additions or changes to alws and regulations") *rev'd in part on other grounds sub nom., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001). Accordingly, the Court finds that the Illinois Sudan Act's amendment to the Illinois Pension Code is unconstitutional.

### 4.  National Bank Act

---

pensions. The Court expresses no opinion regarding the constitutionality of a more narrow amendment to the Illinois Pension Code or whether the state is a market participant with regard to state-funded pensions.

Plaintiffs also contend that the amendment to the Deposit of State Moneys Act is preempted by the National Bank Act. The Court need not reach this issue because it has already found that portion of the Illinois Sudan Act unconstitutional on other grounds.

### 5. Permanent injunction

Plaintiffs are entitled to a permanent injunction barring enforcement of the Illinois Sudan Act. They have succeeded on the merits with regard to their Supremacy Clause and Foreign Affairs Clause challenges to the amendment to the Deposit of State Moneys Act and with their Foreign Commerce Clause challenge to the amendments to the Illinois Pension Code. Plaintiffs have also established the other requirements for a permanent injunction. First, the restrictions on the ability of banks to accept Illinois deposits and the pension funds' ability to invest in many equities and mutual funds unquestionably constitutes irreparable injury. Second, the plaintiffs have no adequate remedy at law. Defendants are state officials who have sovereign immunity from suits for damages. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1997). Finally, the balance of equities, both with regard to the defendants and the public, favors entry of an injunction. As the Seventh Circuit has held, "there can be no irreparable harm to a [government entity] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). Moreover, "the public interest is served by any abatement of unconstitutional activity." *Decker v. U.S. Dept. of Labor*, 473 F. Supp. 770, 776 (E.D. Wis. 1979).

### Conclusion

The Clerk is directed to substitute Alexi Giannoulias for Judy Baar Topinka as a defendant.  For the reasons stated above, the Clerk is directed to enter judgment in favor of the plaintiffs, permanently enjoining the defendants from enforcing the Illinois Sudan Act.

Plaintiffs' motion for preliminary injunction is terminated as moot [docket no. 26-1].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   February 23, 2007